**NOT FOR PUBLICATION**

## UNITED STATES BANKRUPTCY APPELLATE PANEL

## OF THE NINTH CIRCUIT

| | |
|---|---|
| In re: | ) BAP No.  CC-10-1342-SaPaKi |
| | ) |
| JONG E. SONG, | ) Bk. No.  RS 08-15238-MJ |
| | ) |
| Debtor, | ) Adv. No.  RS 08-01291-MJ |
| _____ | ) |
| JONG E. SONG, | ) |
| | ) |
| Appellant, | ) |
| | ) |
| v. | ) M E M O R A N D U M* |
| | ) |
| BARBARA A. ACOSTA; | ) |
| DEBRA M. NILA, | ) |
| | ) |
| Appellees. | ) |
| _____ | ) |

Argued and Submitted on May 13, 2011,
at Pasadena, California

Filed – September 30, 2011

Appeal from the United States Bankruptcy Court
for the Central District of California

Honorable Meredith A. Jury, Bankruptcy Judge, Presiding
_____

Appearances:    W. Derek May of Law Offices of Stephen R. Wade,
                P.C., argued for Appellant.

                Arnold Wuhrman of Serenity Legal Services,
                Murrieta, California, argued for the Appellees.
                _____

Before: SARGIS,** PAPPAS, and KIRSCHER, Bankruptcy Judges.

---

   * This disposition is not appropriate for publication.
Although it may be cited for whatever persuasive value it may
have, see Fed. R. App. P. 32.1, it has no precedential value.
See 9th Cir. BAP Rule 8013-1.

   ** Hon. Ronald H. Sargis, Bankruptcy Judge for the Eastern
District of California, sitting by designation.

Defendant Jong E. Song ("Debtor"), the debtor in the underlying Chapter 7 bankruptcy case, appeals from a judgment denying him a bankruptcy discharge pursuant to 11 U.S.C. § 727(a)(4)(A).[1] Because the unchallenged findings support the bankruptcy court's decision, the bankruptcy court correctly applied the law, its factual findings are supported by the record, and the one arguable error the bankruptcy court made was harmless, we AFFIRM.

## I. SUMMARY OF THE CASE

This appeal is taken from a judgment denying the Debtor his discharge based on a violation of § 727(a)(4)(A), the giving of a false oath or account in or in connection with his case. The Debtor commenced a Chapter 7 case on May 7, 2008, by the filing of a petition, which was not accompanied by schedules or the statement of financial affairs. On May 22, 2008, the Debtor filed with the assistance of counsel his schedules and statement of financial affairs; the accuracy of the information disclosed therein became the focus of this adversary proceeding. Nearly ten months later, on March 11, 2009, the Debtor filed a substitution of counsel; amended Schedules B, F, I, and J; and an amended statement of financial affairs. When all the pleadings relevant to this appeal were filed, the Debtor was represented by counsel.

The Debtor is a medical doctor. In 2004, two of his

---

[1] Unless otherwise indicated, all chapter, section, and rule references are to the Bankruptcy Code, 11 U.S.C. §§ 101-1532, and to the Federal Rules of Bankruptcy Procedure, Rules 1001-9037.

employees, Barbara Acosta and Debra Nila ("Plaintiffs"), accused the Debtor of misconduct during their employment. After complaining directly to the Debtor, the Plaintiffs also reported his conduct to the California Medical Board and the Medical Board commenced an investigation. The Debtor was subsequently involved in a physical confrontation with the husband of one of the Plaintiffs, which resulted in the filing of a minor criminal charge against the Debtor. Through 2004 and the first half of 2005 the Debtor continued with his profitable medical practice, the Medical Board proceeded with its investigation, and no lawsuits were filed by or against the Debtor.

Sang Song, the Debtor's wife of 37 years, filed for dissolution of their marriage in December 2004. The dissolution was uncontested, with Sang Song and the Debtor entering into a written agreement on March 31, 2005, for the dissolution of their marriage. A Judgment of Dissolution was entered on May 13, 2005, which incorporated the written dissolution agreement. Because they concluded that physical separation was not practical, the Debtor and Sang Song continued to live in the same home. The dissolution agreement provided for the division of assets between Sang Song and the Debtor, with Sang Song receiving the family home, and quitclaim deeds were recorded. Additionally, under the dissolution agreement Sang Song waived the right to spousal support.

While the dissolution was properly documented and final judgment was entered by the state court, the Debtor and Sang Song did not disclose their divorce to family or friends. The Debtor and Sang Song entered into an agreement allowing the Debtor to

-3-

pay between $2,500 and $3,000 per month to Sang Song for room, board, and other living expenses. As of the dissolution, the Plaintiffs had not asserted any claims against the Debtor or threatened to sue him. However, in September 2006, the Debtor commenced multiple lawsuits against the Plaintiffs and the husband of one the Plaintiffs. The litigation did not go well for the Debtor, with judgments entered against him on all three suits including awards in favor of the Plaintiffs for $40,258 in damages and $40,906 in attorneys' fees and costs.

The Debtor attempted to set aside the judgments, ultimately failing in each effort. The Plaintiffs, through their attorney, began aggressive collection efforts against the Debtor, including executing on his business checking account and attempting to execute on his profit-sharing plan in March or April 2008. In response, the Debtor stopped using his business checking account and paid his business expenses through Sang Song's personal checking account. Sometime in May 2008 the Debtor established a new business checking account.

The testimony at trial was not clear how monies transferred through Sang Song's checking account were reconciled and accounted for between the Debtor and Sang Song. The Debtor testified that he repaid Sang Song — with some payments being pre-petition and not disclosed on the statement of financial affairs filed by the Debtor under penalty of perjury — to balance the books for the use of her checking account. The Debtor was free to use Sang Song's checking account from March 2008 through May 2008 because Sang Song was traveling in Korea using $10,000 given to her by the Debtor.

In response to Plaintiffs' state-court judgment enforcement efforts against the profit-sharing account, the Debtor filed two claims of exemptions in state court. The state-court judge denied the claims of exemption, leaving the Plaintiffs free to execute against the profit-sharing account. Having failed in state court, the Debtor then obtained representation from what the bankruptcy court describes as well-respected consumer-bankruptcy counsel and commenced the Chapter 7 case.[2]

The Debtor's original and amended Schedules and Statements of Financial Affairs became the focus of this adversary proceeding to deny his discharge. The Plaintiffs commenced the adversary proceeding contending, among other grounds, that the Debtor should be denied a discharge because he had knowingly and fraudulently, in or in connection with the bankruptcy case, given a false oath or account. § 727(a)(4)(A).

After a four-day trial, the bankruptcy court determined that the Debtor had knowingly and fraudulently given a false oath in his Chapter 7 case with respect to the following information:

1.  Neither the original nor the amended statement of financial affairs disclosed the payment of $10,000 to the Debtor's ex-wife in early 2008.

2.  Neither the original nor the amended statement of financial affairs disclosed the withdrawal of $9,000 by the Debtor from his business (a sole-proprietorship medical practice) account, which was used to pay either Betty Song, his daughter, or other expenses outside the ordinary course of business. The

---

[2]  The facts stated in the Summary of Case are taken from the Bankruptcy Judge's decision.

-5-

bankruptcy court found the Debtor's testimony to be that he paid Betty Song in 2007 and 2008.

3. To the extent the Debtor asserts that the payment of $10,000 in early 2008 to his ex-wife was repayment of a debt, it was not disclosed in either the original or amended statement of financial affairs in response to Question 3.

4. Neither the original nor amended statements of financial affairs disclosed substantial payments made to the Debtor's various attorneys during the two-year period preceding the Debtor filing his bankruptcy case.

5. Neither the original nor amended schedules or statement of financial affairs disclosed that the Debtor discontinued the use of his business checking account the month before the bankruptcy case was filed or transfers into and out of an account of his ex-wife, Sang Song, for the operation of his business.

6. The original Schedule I ("Current Income of Individual Debtor(s)") did not disclose the Debtor's substantial Social Security income, and the omission was not corrected for ten months.

7. The original Schedule J ("Current Expenditures of Individual Debtor(s)") did not accurately state the Debtor's expenses. While the Debtor's actual monthly expenses for room, board, and other living expenses were a lump-sum of $3,000 he paid to his ex-wife, the Debtor stated in Schedule J itemized expenses, which did not exist. The itemized expenses are inaccurately stated on Schedule J, totaling $3,910.

8. Neither Schedule G disclosed an executory contract obligating the Debtor to pay $2,500 to $3,000 a month to Sang

Song. The bankruptcy court cited to the written agreement, offered as part of Exhibit 247.

9. The Original and Amended Schedule F misstated unsecured claims purportedly owed to members of the Debtor's family. The obligation to Sang Song was not a loan and the Debtor had no basis for listing a claim for Betty Song, his daughter, because he testified that (1) he did not expect to pay Betty Song and (2) Betty Song never billed him for any legal services she provided him.

10. Neither the original nor amended Schedule F list any business debts relating to the Debtor's sole-proprietorship medical practice.[3]

11. Both the Original and Amended Schedule B filed by the Debtor inaccurately state that the Debtor was due a tax refund of $27,000. In the Fall of 2009 the Debtor testified that the actual refund he expected was $5,000.

The bankruptcy court determined that this bankruptcy filing was part of the Debtor's strategy to flee from the creditors whose judgments arose from his own litigious nature. Using the bankruptcy filing to block the Plaintiffs, the bankruptcy court further determined that the Debtor sought to maintain his life as normal — maintaining his medical practice without fear that the Plaintiffs would enforce their judgment against his business bank accounts and protect his threatened profit-sharing plan. On the

---

[3] Both the Original and the Amended Schedule I filed by the Debtor state that the Debtor's medical practice generates $20,502 a month in income and J states that the Debtor has monthly expenses of $19,152 for his sole-proprietorship medical practice.

-7-

personal side, the Debtor sought to continue his usual living arrangement with his ex-wife, paying her money for living expenses if and when he determined appropriate.

In not disclosing both the $10,000 he paid to his ex-wife for her trip to Korea just before he filed for bankruptcy (whether as repayment of a "loan" or as a gift), and the other monies for living expenses, the bankruptcy court concluded that the Debtor sought to hide the monies from potential recovery by a bankruptcy trustee. As with the transfers to his ex-wife, the Debtor was motivated to not disclose payments he made to his daughter, Betty Song, in 2007 or 2008 for which there were no billings or other documentation that any obligation was owed in the ordinary course of business. For his other attorneys who were fighting the Plaintiffs and defending the criminal matter, the Debtor sought to keep them working and to protect the undisclosed sums he had paid to them from actions by the Chapter 7 trustee.

The bankruptcy court determined that the inaccurate or omitted statements, which were made under oath, were material to the Debtor's bankruptcy case and were made by the Debtor with a knowing, fraudulent intent. The bankruptcy court further found that many of the statements or omissions were made with such reckless disregard for the truth or completeness thereof that they demonstrated an intent by the Debtor to not provide accurate information. When this reckless disregard of the truth was coupled with the Debtor's apparent motive to favor his family, ex-wife, and attorney creditors, and to hide income, assets, and transfers from his known creditors, the knowing intent of the

Debtor to misstate the information in the schedules and statement of financial affairs was established to the bankruptcy court's satisfaction.

Having determined that the Debtor made intentional, knowing, fraudulent statements under oath in his schedules and statement of financial affairs, the bankruptcy court denied the Debtor his discharge pursuant to § 727(a)(4)(A).

## II. ISSUES

1. Whether the bankruptcy court improperly considered post-petition disallowance of claims in determining if the Debtor made a false oath under § 727(a)(4)(A).

2. Whether the bankruptcy court erred when it considered the Debtor's nondisclosure of his social security income when it found that the Debtor had made a false oath.

3. Whether the bankruptcy court's characterization of the Debtor's misstatements of fact in his schedules and statements as "wild guesses" is supported by the evidence.

4. Whether the bankruptcy court erroneously considered the nondisclosure of business creditors on Debtor's Schedule F when no evidence was adduced at trial regarding such lack of creditors and the nondisclosure of business creditors was not a disputed or undisputed fact in the joint pretrial order.

5. Whether the bankruptcy court improperly considered payments the Debtor made within the two-year period prior to filing of the petition to attorneys unrelated to bankruptcy law or debt relief in finding that the Debtor made a false oath.

6. Whether in finding that the Debtor made a false oath the bankruptcy court improperly relied upon the Debtor's

-9-

nondisclosure on Schedule G of an executory contract with his ex-wife, Sang Song, which formed the basis of a disallowed claim.

## III. STANDARD OF REVIEW

We review the bankruptcy court's factual findings for clear error, the selection of the applicable legal rules under § 727 de novo, and the application of the facts to those rules de novo. Searles v. Riley (In re Searles), 317 B.R. 368, 373 (9th Cir. BAP 2004). A court's factual finding is clearly erroneous if it is illogical, implausible, or without support in the record. United States v. Hinkson, 585 F.3d 1247, 1261-62 (9th Cir. 2009) (en banc).

## IV. JURISDICTION

The bankruptcy court had jurisdiction pursuant to 28 U.S.C. §§ 157(b)(2)(J) and 1334(a). The Panel has jurisdiction pursuant to 28 U.S.C. §§ 158(a)(1) and (c)(1).

## V. DISCUSSION

The party objecting to discharge "bears the burden of proving by a preponderance of the evidence that [a debtor's] discharge should be denied." Khalil v. Developers Sur. & Indem. Co. (In re Khalil), 379 B.R. 163, 172 (9th Cir. BAP 2007), aff'd, 578 F.3d 1167, 1168 (9th Cir. 2009) (expressly adopting the BAP's statement of the law). "In keeping with the 'fresh start' purposes behind the Bankruptcy Code, courts should construe § 727 liberally in favor of debtors and strictly against parties objecting to discharge." Retz v. Samson (In re Retz), 606 F.3d 1189, 1196 (9th Cir. 2010) (quoting Bernard v. Sheaffer (In re Bernard), 96 F.3d 1279, 1281 (9th Cir. 1996)). This requires that the objecting party show actual intent, not constructive

-10-

intent. Retz, 606 F.3d at 1196 (quoting Khalil, 379 B.R. at 172).

The Debtor's right to a discharge is tempered by the provisions of § 727(a). One ground for denying the debtor a discharge is where the debtor knowingly and fraudulently, in or in connection with the case, made a false oath or account. § 727(a)(4)(A). "The fundamental purpose of § 727(a)(4)(A) is to insure that the trustee and creditors have accurate information without having to conduct costly investigations." Retz, 606 F.3d at 1196 (quoting Khalil, 379 B.R. at 172). A false oath in the case may include a debtor's false statement or omission in the schedules or statement of financial affairs. Khalil, 379 B.R. at 172.

"To prevail on this claim, a plaintiff must show, by a preponderance of the evidence, that: (1) the debtor made a false oath in connection with the case; (2) the oath related to a material fact; (3) the oath was made knowingly; and (4) the oath was made fraudulently." Retz, 606 F.3d at 1197 (internal quotation marks omitted) (quoting Roberts v. Erhard (In re Roberts), 331 B.R. 876, 882 (9th Cir. BAP 2005)). "A fact is material if it bears a relationship to the debtor's business transactions or estate, or concerns the discovery of assets, business dealings, or the existence and disposition of the debtor's property." Retz, 606 F.3d at 1198 (internal quotation marks omitted) (quoting Khalil, 379 B.R. at 173). The misstatement or omission may be material even though it does not cause direct financial prejudice to creditors. Fogal Legwear of Switz., Inc. v. Wills (In re Wills), 243 B.R. 58, 63 (9th Cir. BAP 1999). False or incomplete information is material if it

-11-

affects the administration of the estate, including the discovery of past transactions by the debtor. Id.

"A debtor acts knowingly if he or she acts deliberately and consciously." Retz, 606 F.3d at 1198 (internal quotation marks omitted) (quoting Khalil, 379 B.R. at 173). To show fraudulent intent, a party must show:

1.    that the debtor made the representations;

2.    that at the time the representations were made, the debtor knew they were false; and

3.    that the debtor made them with the intention and purpose of deceiving creditors.

Khalil, 379 B.R. at 173 (quoting Roberts, 331 B.R. at 884). Intent is typically proven though circumstantial evidence or by inferences drawn from a debtor's conduct. Retz, 606 F.3d at 1199. "Reckless indifference or disregard for the truth may be circumstantial evidence of intent, but is not sufficient, alone, to constitute fraudulent intent." Id.

However, such recklessness is probative of the debtor having fraudulent intent. When coupled with other factors, a pattern of multiple omissions of material assets or information may support the court drawing the inference of fraud by the debtor. Garcia v. Coombs (In re Coombs), 193 B.R. 557, 565 (Bankr. S.D. Cal. 1996). This standard echos the long-standing legal maxim: acta exteriora indicant interiora secreta.[4] Other factors include when the nature of the assets or information suggests that the debtor was aware of them when the schedules were prepared and there was

---

[4] "Outward acts indicate the thoughts hidden within." BLACK'S LAW DICTIONARY 1816 (Dlx. 9th ed. 2009).

-12-

something about the assets or information which the debtor might want to conceal. Id.

**A. The Bankruptcy Court's Decision Is Supported by its Unchallenged Factual Conclusions**

As correctly argued by Plaintiffs, the Debtor has selectively challenged the findings of the bankruptcy court. No appeal has been taken from the bankruptcy court's first, second, third, fifth, seventh, and eleventh findings. Any objections to these findings are waived. Butler v. Curry, 528 F.3d 624, 641 (9th Cir. 2008). The unchallenged findings of the bankruptcy court are that:

First, the Debtor intentionally did not disclose in the Statements of Financial Affairs material information. The first is the transfer of $10,000 to his ex-wife shortly before the commencement of the bankruptcy case in response to Question 10.

Second, the Debtor intentionally did not disclose the withdrawal of $9,000 cash from his sole-proprietorship medical practice bank account to pay his daughter. Further, the Debtor also did not disclose the payments which he subsequently testified were made by him to Betty Song in 2007 and 2008.

Third, to the extent that the Debtor asserts that the $10,000 payment to Sang Song, his ex-wife, was in consideration of a debt, the Debtor did not disclose the payment in response to Question 3.

Fourth, the Debtor did not disclose discontinuing the use of his business checking account one month before the bankruptcy case was filed, and transferring monies into and out of a bank account belonging to his ex-wife, Sang Song, for the operation of

-13-

his business.

Fifth, the original Schedule J did not accurately state the Debtor's expenses. While the Debtor's actual monthly expenses for room, board, and other living expenses were a lump-sum of $3,000 he paid to his ex-wife, Schedule J stated greater itemized expenses which could not be supported.

Sixth, the Debtor misstated that he was due a tax refund of $27,000, when in the Fall of 2009 he subsequently testified that the actual refund he expected was $5,000.

Given these factual conclusions by the bankruptcy court, we must first consider if, assuming that the Debtor is correct in his contention that the bankruptcy court erred in other findings and conclusions, the bankruptcy court's purported errors would have any affect on the outcome. We conclude that the unchallenged findings support the bankruptcy court's judgment denying the Debtor his discharge.

The Debtor's decision not to disclose (1) the $10,000 transfer to his ex-wife, (2) the $9,000 payment to his daughter, and (3) the use of his ex-wife's bank account for the operation of his business, together with the inaccurate reporting of his monthly living expenses on Schedule J and misstatement of his expected tax refund, support the bankruptcy court's conclusion that, by a preponderance of the evidence, he made a false oath regarding material facts with knowing, fraudulent intent.

These uncontested factual conclusions standing alone show a pattern of multiple omissions supporting the bankruptcy court's inference of fraud. The Debtor's reckless disregard of the truth, coupled with the Debtor's obvious motive to favor his

family and ex-wife, as well as to hide income, assets, and transfers from his known creditors, satisfactorily establishes the knowing intent of the Debtor to misstate the information in the schedules and statement of financial affairs.

The Debtor was properly denied his discharge pursuant to § 727(a)(4). Therefore, all of the errors by the bankruptcy court alleged by this appeal were harmless. See Yadidi v. Herzlich (In re Yadidi), 274 B.R. 843, 853 (9th Cir. BAP 2002) (citing Helvering v. Gowran, 302 U.S. 238, 245 (1937) ("In the review of judicial proceedings the rule is settled that if the decision of the court below is correct, it must be affirmed, although the lower court relied upon a wrong ground or gave a wrong reason.")). The decision of the bankruptcy court is affirmed based on the unchallenged findings of fact and conclusions of law.

Nonetheless, the Panel will also address errors the Debtor alleges were made by the bankruptcy court.

**B. The Bankruptcy Court Did Not Consider Post-petition Disallowance of Claims in Finding That the Debtor Made a False Oath**

First, the Debtor contends that the bankruptcy court improperly used a post-petition decision regarding claims held by his close relatives — his ex-wife Sang Song and daughter Betty Song — to make its finding that he made a false oath. The only basis for finding that the family debts were mischaracterized or misstated, according to the Debtor, is the disallowance of their claims in the bankruptcy case. The Debtor argues that the only evidence adduced at trial on this issue was that he believed that

he owed his ex-wife and daughter money.

The Debtor's argument is unpersuasive. In the first instance, he did not provide the Panel with an adequate record to review. While attempting to cast this issue as a question of law — whether the bankruptcy court's consideration of post-petition disallowance of claims was proper — this is actually a question centered on the sufficiency of the evidence before the bankruptcy court and its factual finding, a determination reviewed for clear error. Therefore, the Debtor should have provided the Panel with a full transcript, not some 30 pages of excerpts for a four-day trial. See 9th Cir. BAP Rule 8006-1. The lack of an adequate record to support the contention that the Debtor's belief regarding the debts was the only evidence offered at trial is cause to affirm. See In re Friedman, 126 B.R. 63, 68 (9th Cir. BAP 1991) (failure to provide an adequate record may be grounds to affirm).

Moreover, as Appellees argue, the bankruptcy judge did not rely upon the disallowance of the claims to conclude that the Debtor mischaracterized or misstated the debts owed to Sang Song and Betty Song. Rather, the bankruptcy court relied upon the Debtor's own testimony at trial where he testified that he paid Sang Song $2,500 - $3,500 per month for living expenses,[5] not a personal loan identified on Schedule F. Further, while the Debtor scheduled his debt to Betty Song as $20,000, he admitted

[5] The Debtor testified, "Well, we signed, we agreed, if I have money, I'm going to pay her minimum $2,500 per month. That include [sic] rent, and then boarding, and other — like the utilities, anything — the house maintenance." Trial Tr. 144:14-17.

-16-

that he never really knew how much Betty Song charged him for services though May 1, 2008.[6] There was sufficient evidence before the bankruptcy court for its determination that the Debtor mischaracterized or misstated the debts owed to Sang and Betty. This determination was made not on reliance of the allowance or disallowance of a claim, but rather based on the Debtor's own testimony at trial.

**C. The Debtor's Decision to Not Disclose the Social Security**

---

[6] The testimony at trial was:

Q  As you sit here today, do you have any dollar amount in mind as to what Betty charged to prepare and file those three civil lawsuits?

. . .

A  I cannot even estimate, but I believe she charged me $200 per hour, and then maybe like filing fees, and maybe there might be extra fees because I think it's beyond just a charging how many hours. But – so whatever normal regular type fees, filing, something like that.

. . .

Q  Doctor Song, at any time when Betty was performing legal services for you from 2004 until May 1st of 2008, did you ever ask her, "how much will this cost me?"

A  Not any specific amount. But I wanted to know, then she said, well I have my own handwritten record. Then I didn't really pursue how much. But when she mentioned, like for '04, say $7,000, if I had money I'd pay her $7,000.

But if I wanted I can really ask her, like a regular private practice, the invoices, but I wasn't really interested in that.

Trial Tr. 53:18-55:7.

**Benefits Was Material**

The Debtor next contends that the nondisclosure his $1,980 monthly Social Security benefit was not material because the claims against him were for primarily nonconsumer debts, he only began receiving the benefit in September 2007, and the benefit is exempt. The Panel reviews this question of law de novo.

Social Security benefits must be disclosed on Schedule I. Keith M. Lundin & William H. Brown, Chapter 13 Bankruptcy, 4th Edition, § 35.10, at ¶ 8, Sec. Rev. May 12, 2009, (discussing a debtor's obligation of full disclosure). The fact that the Debtor filed for bankruptcy protection under Chapter 7 did not relieve him of this obligation. As the bankruptcy estate includes all legal or equitable interest of a debtor on commencement of the case, inclusion of Social Security benefits is proper even when those benefits may be exempted. Looney v. Feldman (In re Feldman), 242 B.R. 88, 93 (Bankr. S.D. Fla. 1999). While the Feldman court concluded that not disclosing Social Security beneifts was immaterial because of the exempt nature of the benefits, at least one other court found that not disclosing Social Security income for two years was material. Chambers v. Coon (In re Coon), No. 6:07-ap-00048-AAB, 2008 Bankr. LEXIS 3561, at *14-*15 (Bankr. M.D. Fla. 2008). Still other courts have found that not disclosing fully exemptible assets or assets that will not be disbursed to creditors through the bankruptcy estate is material. See Coombs, 193 B.R. at 566 (401(k) plan); Mertz v. Rott (In re Mertz), 955 F.2d 596, 598-99 (8th Cir. 1992) (fully-exempt state income tax refund).

In fact, the disclosure of the benefits ten months after

-18-

filing of the petition accounted for 68.5% of the swing in the Debtor's monthly net income ($1,980 of $2,890) as reported on the amended Schedule J. While the benefits are exempt in the Chapter 7 proceeding, disclosure of the benefits is required to afford creditors and the trustee accurate information about a debtor's financial position without having to conduct costly investigation. See Retz, 606 F.3d at 1196.

The Debtor's argument that the trustee and creditors could have determined the possible existence of additional wealth hidden from view through a review of his schedules is unpersuasive. This argument is premised on the fact that the bank account holding the accumulated Social Security benefits was disclosed on Schedule B.[7] However, neither the schedules nor the original or amended Statements of Financial Affairs disclosed the source of these funds and Schedule C, which apparently was never amended, claims the funds exempt pursuant to California Code of Civil Procedure § 703.140(b)(5) (the "wildcard" exemption). From this record, it is unclear to us how the trustee and creditors were to divine the existence of the Debtor's Social Security benefit since the source of the funds in the personal savings account was not disclosed, the funds were not marked as not property of the estate, nor was the fact that the Debtor was even receiving Social Security benefits disclosed.

Not disclosing the Social Security benefits, even in this

---

[7] Presumably the Debtor refers to the "Citibank Individual Savings - Account Number 1997" which had a balance of $16,600 on the petition date, the only personal bank account disclosed on Schedule B.

nonconsumer case, denied the trustee and creditors the full financial picture to which they were entitled. If the trustee, creditors, and other parties in interest could be expected to believe the schedules, the Debtor was losing $2,580 every month. In fact, the Debtor's amended schedules state that he had monthly net income of $310. The bankruptcy court properly found this omission to be material.

**D. The Bankruptcy Court's Characterization of the Debtor's Misstatements of Fact in the Schedules and Statements as "Wild Guesses" is Supported by the Evidence**

Next, the Debtor challenges the bankruptcy court's factual finding that his misstatements and mischaracterizations of his debts, income, and expenses represented "wild guesses." This factual finding is reviewed for clear error. Searles, 317 B.R. at 373.

Again, the Panel notes that this issue may be summarily rejected as the Debtor did not provide an adequate record. For the Panel to properly review the challenged factual finding, the Debtor should have provided the Panel with a full transcript, not some 30 pages of excerpts for a four-day trial. Only with the complete record could the Panel review the sufficiency of the evidence before the bankruptcy court to support its factual finding. The Debtor did not provide an adequate record supporting his contention that insufficient evidence underpins the bankruptcy court's finding that the misstatements and mischaracterizations were "wild guesses," which is cause to affirm. 9th Cir. BAP Rule 8006-1; Friedman, 126 B.R. at 68. However, even looking at the record provided, the Panel cannot

find that the bankruptcy court committed clear error.

The Debtor argues that even if some of the items in his schedules and statements were not accurate, this does not qualify them as "wild guesses." The only place in the record before the Panel where the Debtor utters the phrase "wild guess" is when he answered questions relating to exemptions in a state-court levy proceeding. The phrase "wild guesses" appears only four times in the bankruptcy judge's opinion.[8] The bankruptcy judge's opinion does indicate at two places that the Debtor stated that his initial disclosures or schedules were "wild guesses." This attribution is unsupported by the record before us and the issue was conceded by Plaintiffs at oral argument.

However, the misattribution does not undermine the actual

---

[8] The appearances are as follows:

"Debtor's explanation that these inaccuracies were pure negligence or oversight falls woefully short, especially coming from a person who said under oath that his initial disclosures of financial information were 'wild guesses.'" Mem. of Decision on Obj. to Discharge ("Mem. Dec'n") 4:24-5:1.

"Perhaps this itemization was part of what Dr. Song was referring to when he said his initial schedules were 'wild guesses.'" Id. at 18:5-6.

"The sums owed to Betty were apparently more of Dr. Song's 'wild guesses' because his testimony was first that he did not expect to pay her, then that he expected to pay her but she never presented him with a billing until after the bankruptcy petition was filed." Id. at 18:11-14.

"Dr. Song's failure to provide full disclosure of his assets, income and transactions prior to bankruptcy was not an accident and he made no attempt to correct his initial 'wild guesses' until he had had plenty of time to understand the potential consequences of the initial falsity." Id. at 19:23-20:1.

factual finding that the Debtor's "initial Schedule J was a total misstatement of the Debtor's expenses, not reflecting his accurate monthly lump sum payment to Sang Song for room and board and other living expense, but instead itemizing [fictional] expenses . . . ." Mem. Dec'n 18:3-5.

To the extent that the bankruptcy judge may have incorrectly cited the source of the "wild guesses" phrase, this does not undercut her finding that expenses on the initial Schedule J were fiction. Nor was it improper for the bankruptcy judge to use the Debtor's own words — though lifted from a slightly different context — to describe his conduct in the bankruptcy case. Judges have many different literary techniques at their disposal and the effective use of these techniques should not be unnecessarily frustrated. See, e.g., In re Judicial Misconduct, 632 F.3d 1289, 2011 U.S. App. LEXIS 2108, at *2-*3 (9th Cir. Jud. Council 2011) (discussing the use of humor as an effective literary tool which does not violate Code of Conduct for United States Judges).

The bankruptcy court's underlying factual finding — that the initial schedules were inaccurate — is supported by the evidence and the bankruptcy court's decision is not clearly erroneous. The fact that the bankruptcy court elected to use the Debtor's own words to emphasize that he did not base his disclosures in the schedules and statement of financial affairs on the accurate information available to him does not render bankruptcy judge's decision reversible.

**E. The Bankruptcy Court Properly Considered the Absence of Business Creditors on Debtor's Schedule F**

The 32-page joint pretrial order in this adversary

-22-

proceeding did not, according to the Debtor, create a basis for the bankruptcy court to conclude that he did not list business creditors on Schedule F. Because this was not a disputed or undisputed fact, the Debtor concludes that the bankruptcy court improperly considered this factor in determining that he made a false oath. Appellants concede the issue in their briefs, but argue that the error was harmless. The Panel reviews this issue of law de novo and concludes that both parties are incorrect.

It is undisputed that the original and amended schedules were admitted into evidence at trial. As the bankruptcy court observed, neither of the Schedules F included any business creditors other than Appellees. On this point, the bankruptcy court said, "Dr. Song was not a corporation and on any given date he clearly had business obligations which were unpaid, including the petition date." Mem. Dec'n 18:15-17. Though unstated, it is apparent that the bankruptcy court took judicial notice, pursuant to Federal Rule of Evidence 201(b)-(c), of the fact that ongoing businesses have obligations that remain unpaid at any given point in time. That this issue was not listed in the joint pretrial statement is not fatal to the decision. See Fed. R. Civ. P. 15(b)(2) incorporated by Fed. R. Bankr. P. 7015.

The Panel does note that bankruptcy court's findings do not include any statement that such creditors existed. Though the absence of such business expenses is contrary to common experience, the Panel gives this finding minimal weight in affirming the bankruptcy court. The other misstatements and omissions are sufficient to sustain the judgment.

**F. The Bankruptcy Court's Consideration of Undisclosed Payments to Attorneys for Services Unrelated to Bankruptcy Law or Debt Relief was Proper**

The Debtor also attacks the bankruptcy court's finding that he committed a false oath when he did not disclose payments to attorneys for services unrelated to debt relief or his bankruptcy. Because the services were not related to debt relief or his bankruptcy, he contends that disclosure was not required by Question 9 on the statement of financial affairs.

However, the bankruptcy court's opinion notes that in responding to Question 10 on the statement of financial affairs the Debtor did not disclose payments during the two-year period prior to filing of the petition. Unlike Question 9, which asks about transfers during the one-year period prior to filing, Question 10 of the statement of financial affairs requires disclosure of transfers not made during the ordinary course of business during the prior two-year period.

The Debtor rejoins that he "likely did not consider payment of attorneys['] fees as billed as transfers [outside] the ordinary course of business or financial affairs that should be disclosed in Question Number 10 . . . ." Aplt. Op. Br. p. 16 (emphasis added). This is an interesting choice of words by the Debtor and undercuts his contention that an accurate disclosure of these payments is not required or material. Merely contending a hypothetical belief by the Debtor and not directing the bankruptcy court, and now the Panel, to actual evidence of what the Debtor actually intended to do will not carry the day.

The Debtor also argues that since there is no clear place on

the statement of financial affairs to disclose the payment of attorneys' fees, his nondisclosure is a reasonable omission which should not serve as a basis for a finding of a false oath. This argument is unconvincing. The Debtor has a duty to prepare the petition, statements, and schedules carefully, completely, and accurately. Cf. Cusano v. Klein, 264 F.3d 936, 945-946 (9th Cir. 2001) (holding that a debtor has a duty to prepare schedules carefully, completely, and accurately) (quoting In re Mohrig, 142 B.R. 389, 394 (Bankr. E.D. Cal. 1992)). To allow a debtor to ignore this duty because he or she believes there is "no clear place" for the disclosure would render this basic obligation of a debtor a nullity, turning the bankruptcy process on its head. Schedules and statements of financial affairs are sworn statements, signed by debtors under penalty of perjury. "Adopting a cavalier attitude toward the accuracy of the schedules and expecting the court and creditors to ferret out the truth is not acceptable conduct by debtors or their counsel." AT&T Universal Card Servs. Corp. v. Duplante (In re Duplante), 215 B.R. 444, 447 (9th Cir. BAP 1997). This Debtor was represented by counsel throughout the entire bankruptcy case. He did not have to "guess" as to what information is required — he was advised by knowledgeable bankruptcy counsel every step of the way. For whatever reason, he decided to omit this information.

Moreover, the Debtor had a clear duty to disclose the payments in response to Questions 3 and 10 on the statement of financial affairs. The evidence at trial demonstrated that the Debtor was a medical doctor involved in extensive litigation during the two years prior to the filing of the petition. Though

the Debtor suggests that whatever payments he made to attorneys were in the ordinary course of business, at least those payments made to a criminal-defense attorney could not have been in the ordinary course of business. Further, the Debtor was embroiled in the litigation which resulted in the two judgments against him that were being aggressively enforced and resulted in the filing of this bankruptcy case. As the Debtor did not meet his duty in responding to Question 10, the bankruptcy court's determination was proper.[9]

**G. The Bankruptcy Court Incorrectly Relied on the Debtor's Purported Nondisclosure of Executory Contract with His Ex-Wife on Schedule G**

Finally, the Debtor argues that the bankruptcy court improperly concluded that Schedule G did not disclose an executory contract under which the Debtor was making payments of $2,500 to $3,500 a month to Sang Song. The Debtor contends that this is improper because the bankruptcy court subsequently determined that Sang Song did not have a claim in the case and, therefore, there was no executory contract for him to list on Schedule G. This presents a question of law which the Panel

---

[9] This also raises an issue as to what payments should also have been disclosed in response to Question 3(b), payments made to any creditor which exceeds $5,475 to any one creditor within ninety days of the commencement of the bankruptcy case or any payments made within one year to an insider. The Debtor's Original and Amended Schedule J lists business expenses of $19,152 per month. This includes $7,277 for payroll, $3,809 for rent, and $3,619 for professional fees. None of these are listed in response to Question 3(b), though clearly the rent (and most likely some payments to employees and professionals) exceed $5,475 in the ninety-day period prior to the bankruptcy filing.

-26-

reviews de novo.

The bankruptcy court determined that the Debtor did not list the executory contract which was presented in Exhibit 247 at trial. Exhibit 247 is Sang Song's limited opposition to an objection to her proof of claim for priority spousal support debt. The exhibit includes the declarations of Sang Song and the Debtor, as well as the Exhibit A described in the bankruptcy court's decision. Exhibit A is a one-page, handwritten document purportedly signed by Sang Song and the Debtor. The terms of this agreement state that when the Debtor needs financial assistance to operate his medical practice, Sang Song agrees to help him in unstated amounts, if she has enough money, and the Debtor agrees to repay her, on unstated terms, when he is able to do so. Further, they agree that the Debtor will pay Sang Song $2,500 to $3,000 a month, when the Debtor is able to do so. Finally, the Debtor agrees to provide undefined help to Sang Song, who is stated to have rheumatoid arthritis and chronic bronchiectasis, when she needs medical help and has problems with daily activities. Exhibit B to the opposition included in Trial Exhibit 247, which Sang Song identifies as a handwritten ledger of payments from the Debtor, states that the $2,500 to $3,000 a month is for living expenses, and that if the Debtor does not have enough money to pay the living expenses, they can be paid later (on unstated terms and at an unstated time) as a loan.

The decision of the bankruptcy court does not include the basis for the determination that the Debtor knew or should have known that he had an executory contract to be listed on Schedule G, rather than listing Sang Song as a creditor on

-27-

Schedule F. Neither of the parties address this issue, but assume that there was an executory contract, with the Debtor contending that since the claim of Sang Song was denied there could not be misstatement under oath.

The analysis of this issue begins with § 365, which provides for the treatment of executory contracts and leases, but does not provide for a definition of either. The case law has adopted what is commonly referred to as the "Countryman Definition" that:

> a contract is executory if "the obligations of both parties are so unperformed that the failure of either party to complete the performance would constitute a material breach and thus excuse the performance of the other."

Unsecured Creditors' Comm. v. Southmark Corp. (In re Robert L. Helms Constr. & Dev. Co.), 139 F.3d 702, 705 (9th Cir. 1998) (citation omitted) ("Helms"). The contract will not be considered executory if performance does not remain due on both sides to some extent. In Helms the Ninth Circuit concluded that an option to purchase property which was not exercised prior to the commencement of the bankruptcy case was not an executory contract because the duties between the parties remained too speculative. Id. For the purposes of federal law, it is well established that a contract is executory if the failure of one party to perform would constitute a material breach under applicable state law. In re Rega Properties, Ltd., 894 F.2d 1136, 1139 (9th Cir. 1990) (quoting Hall v. Perry (In re Cochise College Park, Inc.), 703 F.2d 1339, 1348 n.4 (9th Cir. 1983)).

Though the conduct of the Debtor in this case may well have been grounds for the bankruptcy court to question the veracity of his statements and the true intentions of listing Sang Song on

-28-

Schedule F, the Panel cannot conclude that there was an alleged executory contract sufficient that the failure to include Sang Song on Schedule G constitutes a violation of § 727(a)(4)(A).

Both parties must have an obligation to perform for the contract to be executory. Helms, 139 F.3d at 706. The contract is not an executory contract for purposes of the Bankruptcy Code if the continuing duties between the parties are too speculative. Performance due in the future only at the discretion of one party is not sufficient. Id.

For the obligation owed to Sang Song, neither the record nor the bankruptcy court's decision establish what obligations either the Debtor or Sang Song were required to perform in the future. The Debtor was not required to continue to live in Sang Song's home or to pay any amounts at a specific time. The Debtor could pay when he thought he had enough money. Sang Song was not committed to allow the Debtor to live at her house and for her to provide the Debtor with other living necessities for any specified period in the future. Both could just walk away from their understanding.

The record does not establish that there was so clearly an executory contract to warrant finding that the Debtor made a false oath by not listing it on Schedule G. Nevertheless, this error is harmless as the weight of the other factual findings support the bankruptcy court's conclusion. See Yadidi, 274 B.R. at 853.

## VI. CONCLUSION

In addition to the unchallenged material nondisclosures and inaccurate disclosures which are sufficient, in and among

-29-

themselves, to affirm the bankruptcy court ruling, the Panel determines that all but one of the challenged findings are supported by the record. For the one finding which is not supported by the record, the error is harmless.

We conclude that bankruptcy court correctly applied the provisions of § 727(a)(4)(A) and its decision determining that the Debtor knowingly and fraudulently made false statements under oath in his schedules and statements of financial affairs is not clearly erroneous.

The decision of the bankruptcy court is **AFFIRMED.**